Wilkin, J.,
concurring. The city council by ordinance ' directed the auditor to appropriate $1,000 from the general fund of the city “for the purpose of establishing a municipal moving picture theater.”
*99 The relator concedes that nowhere do the statutes of the state confer any authority upon municipal councils to maintain or establish moving-picture theaters. The power to do that thing is predicated upon Section 3 of Article XVIII of amendments to the constitution of the state, adopted September 3, 1912, viz.: “Municipalities shall have authority to exercise all the powers of local self-government.”
The council is not the municipality; it is but an agent of the municipality. When this agent was appointed, its powers were definitely enumerated in the municipal code. It had not “all the powers of local self-government,” and the particular power now claimed by it is not one of those designated in the code.
It is only begging the question to say, the clause quoted from Article XVIII confers the power upon the municipality. The question is, Has the municipality, the civil organization of the people of the city of Toledo, assumed all the power- thus conferred upon it by the people of the state?
It cannot be argued that an agent of the- municipality, chosen before the state granted to municipalities all this local-governmental power, may exercise a power not within the scope of the agency ■when the agency was created. There is no pretense that the principal (the people of the city) has done anything since the council was elected to enlarge the authority of the agent (the council). The action of this council is based solely upon the first clause of Section 3, Article XVIII. And the argument of the relator- is that the clause shall be interpreted to read thus: Municipal coun *100 cils shall have authority to exercise all the powers of local self-government.
If this be true, this amendment of the constitution at once exalts the creature (the council) above its creator (the municipality). The city of Toledo has not only not a government by the people (which is self-government), but all the powers of government are at once thrust into the hands of municipal councilmen.
If this council may do what it seeks to do by this ordinance, it may at once proceed to exercise all the powers conferred by Article XVIII of the .constitution upon the people of the city. Any council may by a series of ordinances forge upon the people of any city a system of city government to suit the politicians, whereas the very purpose of the home-rule amendment is to lodge directly with the people of the municipality the authority to govern their local domestic affairs within the territorial limits of the city as they may choose.
The people of the commonwealth as the paramount sovereign have the ultimate power to create and govern municipal corporations within the state. The former constitution delegated that power in part to a representative branch of sovereignty, the state legislature. The latter in turn passed over to the municipal lawmaking bodies a share of that power. The advocates of home rule proclaimed that the machinations of politicians and petty bosses, and the occult trade of the lobby, during the last half century, have beguiled these state and city legislators of the interests of the people and diverted those interests to venal uses.
*101 The eighteenth amendment to the constitution was adopted by the people of the state to thwart this perversion and abuse of power, by giving to the people of the municipalities the' authority of controlling their own local affairs by any system of municipal government which they may choose, but subject to certain constitutional restraints. Municipal home-rule therefore means the very opposite of boss-rule, whether the bosses rule through the municipal council or the state legislature.
The purpose of the home-rule amendment (Article XVIII) is to pass the sovereign power of municipal government (within certain subjective limitations) directly from the people of the state to the people of the city, if the latter choose to exercise it. In other words, it parcels out a definite branch of the paramount sovereignty of the commonwealth to certain territorial subdivisions of the state, whose electors by popular ballot decide to assume and to exercise the local sovereignty thus permitted to them as “municipalities,” that is, as the incorporated people of a village or city. When the people have elected thus to become a local sovereign, then it may “exercise all the powers of local self-government,” through a council, or a director, or a town-meeting, as it may please.
There is no suggestion in this case that the people of Toledo have relieved its council from the restrictions of “the general laws” (which define the councils limited powers), and that the people have made the council a free lance to range over the whole domain of municipal government at will. ,
*102 Grant that this particular ordinance is intended to promote some beneficent end. The people have not adopted it. In the whole record before us there is not á vague hint that the people of Toledo have expressed their wish to have a municipal moving-picture theater, or that the theater is to be endowed and operated for the moral or material well-being of the people. For aught that appears the theater may be- operated purely for gain, in competition with private persons or companies in the same business. And for what purpose or whose benefit the profits will be used, the promoters of this new departure in municipal government have not disclosed. The business may be conducted by the council as a monopoly, to destroy the business of private owners of picture shows. If the city council may thus drive out the picture shows, then why not the barbers, the laundries, the bakeshops, groceries, music teachers, coal dealers, drug stores, newspapers, and so on ad ínñnitumf All these concern the public health, morals and well-being more intimately than exhibitions of' moving pictures for popular entertainment.
Whether this clause of Section 3, Article XVIII, is self-executing or otherwise, we need not discuss. The question is not in this case, and only confüsés the issue. One thing is certain. It is not mandatory. By the structure of its language, it is permissive only: “Municipalities shall have authority to exercise all the powers of local self-government.” This is not equivalent to saying they must dr shall exercise, etc.
*103 There is no token in the record that this municipality (the people of Toledo) has chosen, to. avail itself of this grant of all powers of local self-government. Neither the council, the mayor, the director of public safety, nor other agency of the municipality can determine for the people the form, character and objects of their municipal government.
The constitution speaks of but three methods: I. By the state: “General laws shall be passed for the incorporation and government of cities and villages.” (Section 2); II. “Any municipality may frame and adopt a charter for its government” (Section 7) which “shall be submitted to the electors,” etc. (Section 8) ; III. Both of these methods may be combined: “Additional laws may be passed which shall not become operative until submitted to the electors,” etc. (Section 2).
The city is still governed by the first method— under general laws of the state. The maintenance .of moving-picture theaters is not a function of municipal government authorized by the General Code. Until the electors of the city adopt one of the other methods, no branch of the city government may divert the general funds to the business of managing moving-picture shows for profit.
The question has been mooted and debated in this case, whether the maintenance and management of moving-picture shows is a legitimate function of municipal government. This question would better be raised on a different record than tire one before us. But it has been pressed upon us as one fairly arising upon the facts of the case. As defined by this record, the moving-picture *104 theater must be understood according to the common acceptation—a business for profit. It may be for loss. Public revenue may not be raised nor expended in that way. This is not a function of constitutional government in Ohio. The kinetoscope may be used at some time, in some way, in the proper management of municipal affairs and for the public weal. But the moving-picture show-business, as defined, or rather undefined, in this ordinance, is not a fair instance of such a use. Upon the record before us, it is, to say the least, prima facie ultra vires of the municipal council.
The relator has failed to show us that such a use of public funds in a business of profit or loss, in competition ■ with private enterprise, is a function of government, so far as the people of Ohio have as yet, during one hundred and ten years of statehood, by their courts or in their constitution or the recent amendments thereto, defined their theory and practice of government.
By entitling this amendment “Home Rule,” did the revisers of the constitution indicate more than a redistribution of some powers of government, shifting all legislation in local affairs from the general assembly of the state to the electorate of incorporated urban communities ? Or did they indicate a change of the essential nature of government from the free American plan of individualism toward the foreign cults of communism and paternalism? To the people of Ohio who adopted it, “Home Rule” signified the former change rather than the latter. We are aware that the regulation of the intensely complex and highlv artificial life of great modern cities is a problem *105 of practical sense and skill rather than of philosophic theory. Probably the ideal system of municipal management is a composite form of individualism modified as to certain communal interests by paternal favor and oversight. The evolution of modern city government seems to be toward that ideal. We do not seek to retard it.
This court is not dealing with a priori theory. Our province is to interpret a formal fact and to deduce its meaning from the document in which it is couched. True, we may view the fact in the historical perspective, but only to find its genesis in the common law of the land; as Coke says: “Out of the old fields springeth the new corn.” Our question is: Does the document embody a quiet revolution or a social evolution? The latter, we think. It is not a new constitution, but a modification of the old. Nowhere in the original constitution of Ohio, nor probably in any of the last-century state charters, can we find the power of taxation employed for competitive enterprise in the hazard of profit and loss, or that such an enterprise is within the sphere of constitutional government according to the American idea. If the people of Ohio meant to depart so radically from the ancient landmarks, they should and would have used proper language to convey that meaning.
Sections 4, 5 and 6 of Article XVIII, empower municipalities to acquire and operate certain designated public utilities. No claim is made that the business of moving-picture theaters is included in this additional grant of power; theaters are not “utilities” and are not mentioned in the grant. Expressio unius exclusio alteriiis est.
*106 What is the proper range of government is not a legal but a political question to be decided by the people. It cannot be solved by speculation, but must ever lie open to the teaching of experiencé and history. But that the people of Ohio on September 3d last voted to make their state a political laboratory in which every village and city may, at the behest of the council. With funds raised by taxation, experiment in every variety of trade or business, as private persons do, is the proposition urged upon us by the advocates for the relator. We must be allowed at least to doubt the soundness of this construction of Article XVIII of the amendments. The rule of law is that the grant of powers to corporate bodies, purely the creatures of law and the agents of the state, is to be strictly construed, and if the grant does not clearly include the power in question, it must be denied. The natural development and safe progress of society, require that the expounders of its constitution shall be cautious—without, of course, being obstructive.
The great and extraordinary writ of mandamus should never issue, unless the right to it is strong and clear and the motives for seeking it are just and lawful, and above suspicion or reasonable doubt.. The writ should be refused.